# 14-1441-CV

# United States Court of Appeals

## for the

## Second Circuit

◆●◆

JEWISH PEOPLE FOR THE BETTERMENT OF WESTHAMPTON BEACH,
ARNOLD SHEIFFER, ESTELLE LUBLINER,

*Plaintiffs-Appellants,*

– v. –

THE VILLAGE OF WESTHAMPTON BEACH, EAST END ERUV ASSOCIATION,
INCORPORATED, VERIZON NEW YORK INC., LONG ISLAND LIGHTING
COMPANY, dba LIPA,

*Defendants-Appellees.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX
## FOR PLAINTIFFS-APPELLANTS

SINNREICH KOSAKOFF & MESSINA LLP
*Attorneys for Plaintiffs-Appellants*
267 Carleton Avenue, Suite 301
Central Islip, New York 11722
(631) 650-1200

## **CORPORATE DISCLOSURE STATEMENT**

Pursuant to Rule 26.1(a) of the Federal Rules of Appellate Procedure, Plaintiff-Appellant Jewish People for the Betterment of Westhampton Beach, Inc. certifies that there are no publicly held corporations that own ten percent (10%) or more of its stock.

# **TABLE OF CONTENTS**

**Page**

Jurisdictional Statement ................................................................ 1

Statement of Issues Presented for Review .................................... 2

Statement of the Case

    i.    Relevant Facts ................................................... 2

          a.    The Parties .......................................... 2

          b.    The Religious Meaning and Content of the Eruv
                 as a Symbolic Ritual Object ................................ 4

    ii.    Procedural History and Rulings Below.................... 7

Summary of Argument.................................................................. 8

Argument

    Appellate Standard of Review................................................. 11

    Standard Applicable to Motions Below .................................... 11

Point I

    APPELLANTS HAVE STANDING ....................................... 13

Point II

    APPELLANTS HAVE STATED AN ESTABLISHMENT CLAUSE
    CLAIM .................................................................................. 22

        Appellants Have Alleged Facts Supporting the Claim that the
        Proposed Eruv Will Violate the Establishment Clause........................ 23

          (i)    An Eruv Serves No Secular Governmental Purpose ............ 26

          (ii)    The Sole Purpose and Effect of the proposed Eruv is the
                  Advancement of a Particular Religious Denomination........ 28

i

(iii)    The Public Display of an Eruv on Governmental Property
Will Result in The Impermissible Entanglement of
Government in Religion ........................................................    34

Conclusion ....................................................................................    38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*ACLU of New Jersey v. City of Long Beach*, 670 F.Supp. 1293
(D.N.J. 1987) ............................................................ 20

*Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d 49 (2d Cir. N.Y. 2001) ........ 14, 16

*Am. Atheists, Inc. v. Shulman*, 2014 U.S. Dist. LEXIS 68148
(E.D. Ky. May 19, 2014)............................................ 22

*Arista Records, LLC v. Doe 3*, 604 F.3d 110 (2d Cir. 2010)...................... 12

*Association of Data Processing Service Organizations v. Camp*,
397 U.S. 150 (1969) ............................................... 14-15

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955 (2007)............. 11

*Bronx Household of Faith v. Bd. of Educ. of City of NY*, 650 F.3d 30
(2d Cir. 2011), cert. denied, 132 S. Ct. 816, 181 L. Ed. 2d 541
(2011)................................................................ 23

*Burwell v. Hobby Lobby Stores, Inc.*, 2014 U.S. LEXIS 4505,
2014 WL 2921709 (2014) ....................................... 36n.8

*Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002)................... 12

*Commack Self-Service Kosher Meats, Inc. v. Hooker*, 680 F. 3d 194
(2d Cir. 2012) .............................................. 23-24, 28, 34

*Conley v. Gibson*, 355 U.S. 41, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)........... 13

*Cooper v. United States Postal Service*, 577 F.3d 479
(2d Cir. 2009) .............................................. 9, 15, 17, 33

*County of Allegheny v. ACLU*, 492 U.S. 573, 109 S. Ct. 3086 (1989)....... 4, 29, 30

*Edwards v. Aguillard*, 482 U.S. 578, 107 S. Ct. 2573 (1987) .................... 24

*Erickson v. Pardus*, 551 U.S. 89, 127 S.Ct. 2197 (2007) ........................... 12

*Freedom from Religion Found., Inc. v. New Kensington-Arnold Sch. Dist.*, 919 F. Supp. 2d 648, 2013 U.S. Dist. LEXIS 8269, 2013 WL 228331 (W.D. Pa. 2013) ........................................ 22, 24-25

*Freedom from Religion Found., Inc. v. Weber*, 2012 U.S. Dist. LEXIS 168190, 8, 2012 WL 5931899 (D. Mont. Nov. 27, 2012) ....................... 16

*Goldstein v. Fire Dep't of Suffern*, 559 F. Supp. 1389 (S.D.N.Y. 1983) ......................................................................... 24

*Goldstein v. Pataki*, 516 F.3d 50 (2d Cir. 2008) ......................................... 12

*Gregory v. Daly,* 243 F.3d 687 (2d Cir. 2001) ............................................ 13

*Kiryas Joel Alliance v. Vill. of Kiryas Joel*, 495 Fed. Appx. 183 (2d Cir. 2012) ...................................................................... 23

*Lee v. Weisman*, 505 U.S. 577, 112 S.Ct. 2649 (1992) ............................... 21

*Lemon v. Kurtzman*, 403 U.S. 612 (1971) .................................................... *passim*

*Loccenitt v. City of New York*, 2013 U.S. Dist. LEXIS 36330 (S.D.N.Y. Mar. 15, 2013) ............................................................ 22

*Lynch v. Donnelly*, 465 U.S. 668 (1984) ............................................. 31, 32, 35, 36

*Peck v. Baldwinsville Cent. Sch. Dist.*, 426 F.3d 617 (2d Cir. 2005) .......... 23

*Ruston v. Town Board for Town of Skaneateles*, 610 F.3d 55 (2d Cir. 2010), *cert. denied*, 131 S. Ct. 824 (2010) ................................ 12

*Scheuer v. Rhodes,* 416 U.S. 232, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974) ................................................................................. 12

*School District. of Abington Township v. Schempp*, 374 U.S. 203, 83 S.Ct. 1560 (1963) ............................................................... 14, 15

*Sheppard v. Beerman,* 18 F.3d 147 (2d Cir. 1994), *cert. denied,* 513 U.S. 816, 115 S. Ct. 73, 130 L. Ed. 2d 28 (1994) ..................... 12-13

*Sims v. Artuz,* 230 F.3d 14 (2d Cir. 2000) ................................................... 12

*Skoros v. City of New York*, 437 F.3d 1 (2d Cir. 2006) ......................... 23, 27, 31

*Stone v. Graham*, 449 U.S. 39, 101 S. Ct. 192 (1980)................................. 24, 25

*Sullivan v. Syracuse Housing Authority*, 962 F.2d 1101
  (2d Cir. 1992) ............................................................. 14, 16, 17, 19, 20

*Thomas v. Little Flower For Rehabilitation & Nursing*,
  793 F. Supp.2d 544 (E.D.N.Y. 2011)........................................................ 11

*Valley Forge Christian College v. Americans United for Separation
  of Church and State, Inc.*, 454 U.S. 464 (1982)....................................... 19, 20

*Vasquez v. Los Angeles County*, 487 F.3d 1246 (9th Cir. 2007)................. 16, 17

**Statutes:**

United States Constitution, First Amendment ............................... 2, 10, 14, 15, 17

28 U.S.C. § 1291 ..................................................................... 1

28 U.S.C. § 1331 ..................................................................... 1

28 U.S.C. § 1343(a)(3)................................................................ 1

Federal Rule of Civil Procedure 12(b)(1) ...................................... 11

Federal Rule of Civil Procedure 12(b)(6) ................................. 11, 12, 13

Federal Rule of Civil Procedure 12(c) .......................................... 11

**Other Authority:**

"About the CCAR,"  http://www.ccarnet.org/about-us .............................. 36n.9

Fonrobert, Charlotte E., *Neighborhood as Ritual Space: The Case
  of the Rabbinic Eruv*, Berlin 2008............................................ 6n.2

http://www.ccarnet.org/about-us/consitution-bylaws/................................ 37n.10

R. Solomon Ganzfried, CODE OF JEWISH LAW: *Kitzur Shulhan
  Arukh,* Vol. 2, Chapter 82 (Hebrew Publishing Company,
  New York 1993) ...................................................................... 5n.1

Plaintiffs-Appellants Jewish People for the Betterment of Westhampton Beach a/k/a JPOE, Arnold Sheiffer and Estelle Lubliner (collectively hereinafter, "JPOE") appeal from the order of the District Court (Wexler, J.) granting motions to dismiss by Defendant-Appellee East End Eruv Association, Inc. (the "EEEA") and by Defendant-Appellee, Verizon, New York, Inc. ("Verizon"), which order was entered on February 4, 2013, and appeal from the order of the District Court (Wexler, J.) granting Defendant-Appellee Long Island Lighting Company d/b/a LIPA's motion for a judgment on the pleadings, entered on May 23, 2013.

JURISDICTIONAL STATEMENT

The District Court obtained original subject matter jurisdiction of the action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3). The Complaint raises a federal question arising under federal law and/or the United States Constitution and seeks redress for the deprivation of rights secured by the Constitution.

The Court of Appeals possess jurisdiction of the instant appeal pursuant to 28 U.S.C. § 1291.

The appeal is timely. Following the orders dismissing the action as against the EEEA, Verizon, and LIPA, all claims in the action were finally terminated by the dismissal of the action as against Defendant Village of Westhampton Beach, entered on April 2, 2014. Appellants filed their Notice of Appeal on April 25, 2014.

<u>STATEMENT OF ISSUES PRESENTED FOR REVIEW</u>

1. Whether Plaintiffs-Appellants have standing to seek relief under the Establishment Clause of the First Amendment to the United States Constitution.

2. Whether the Plaintiffs-Appellants have stated a claim for an Establishment Clause violation.

<u>STATEMENT OF THE CASE</u>

i.   *Relevant Facts*

   a. *The Parties*

Plaintiff-Appellant Jewish People for the Betterment of Westhampton Beach, Inc., aka JPOE, is a not-for-profit corporation organized and existing under the laws of the State of New York.  Plaintiff Arnold Sheiffer is the Chairman of JPOE.  Plaintiff Estelle Lubliner is a member of JPOE.  Both Sheiffer and Lubliner reside in the Village of Westhampton Beach, one of the Villages in which the appellees seek to erect an *eruv* on publicly owned utility poles.  *See* A-12.

JPOE's membership consists of approximately 300 Jewish and non-Jewish individuals who reside in the Villages of Westhampton Beach and Quogue, and the Town of Southampton, and their environs.  *See* A-16.  JPOE's members oppose the establishment of an *eruv* on government property in their communities because of their sincerely held belief that an *eruv* is inherently, and by intention and design, a

deeply sectarian religious ritual symbol that would communicate a government endorsement of a specific religious practice in which they do not believe or practice, and which some of JPOE's members find exclusionary and offensive. For example, both Sheiffer and Lubliner are observant Jews who belong to Jewish denominations that, doctrinally, do not accept the concept of the *eruv* as a valid interpretation of Jewish law.  *See* A-11-12.

Defendant-appellee EEEA holds itself out to be a not-for-profit corporation formed and operating under the laws of the State of New York for the purpose of advocating the erection and establishment of an *eruv* in certain parts of the Town of Southampton and the Villages of Quogue and Westhampton Beach.  *See* A-12.

Defendant-appellee Verizon New York, Inc. holds itself out to be a private telecommunications corporation organized and existing under the laws of the State of New York, which has entered into a licensing agreement with the EEEA, pursuant to which the EEEA has been granted permission to attach so-called "*lechis*," a physical component of an *eruv*, to Verizon's utility poles located in Westhampton Beach.  *See* A-12, 17-18.

Defendant-appellee Long Island Lighting Company d/b/a LIPA is a corporation organized and existing under the laws of the State of New York, and is a wholly-owned subsidiary of, and operated and controlled by, the Long Island Power Authority, a New York Public Corporation and Public Authority and a

political subdivision of the State of New York.  LIPA has also entered into a licensing agreement with the EEEA to permit the attachment of *lechis* to LIPA utility poles located in the Villages of Quogue and Westhampton.  *See* A-12, 17-18.

Defendant Village of Westhampton Beach is an incorporated Village formed and existing pursuant to the laws of the State of New York.  *See* A-12.

### b. *The Religious Meaning and Content of the Eruv as a Symbolic Ritual Object*

The United Sates Supreme Court has clearly instructed that, when considering an Establishment Clause challenge to government action involving the public display of a religious symbol, it is incumbent on the courts to grapple with and come to an informed understanding of the nature and significance of the religious symbol or object in question in order to inform their constitutional analysis.  *See County of Allegheny v. ACLU*, 492 U.S. 573, 679, fn 60, 109 S. Ct. 3086 (1989).  As the Supreme Court has stated, the absence of such an inquiry is a prescription of ignorance."  *See id.*  In light of this requirement, it would be reasonable in this case to have expected that the appellees, as the proponents of the establishment of the *eruv*, would have provided the District Court with a useful, meaningful and candid description of the doctrine of the *eruv* under Orthodox Jewish tradition as a basis for applying constitutional analysis.  After all, given the fact that the subject of the *eruv* occupies an entire tractate of the Talmud, and two

4

entire volumes of the *Shulhan Arukh*, admittedly the most authoritative codification of Orthodox Jewish law, there is obviously much to say about the religious meaning and content of the *eruv* as a ritual religious symbol. However, the opposite is true. Both in this case as well as in related cases the appellees have commenced against the municipalities, appellees have continued a practice evident in all of the prior litigations on the *eruv* issue of withholding from the courts any meaningful discussion of the religious content of an *eruv* whatsoever, beyond the merely conclusory assertion of its claimed power to relax certain strictures concerning the observance of Shabbat.

In the absence of any meaningful information provided by the proponents themselves, the following brief discussion of the religious meaning and content of the *eruv* may be gleaned from a review of publicly available and widely respected religious and academic sources, including the *Shulhan Arukh* itself.

The establishment of an *eruv* has been defined in one respected text as "a symbolical act by which a legal community is established."[1]  This clear articulation of the fundamental purpose underlying the establishment of an *eruv* contains aspects which are central to the constitutional analysis applicable to the case at bar. First, it confirms that the establishment of an *eruv* is a religiously "symbolical act," i.e., an act that is intended to communicate or convey a significant sectarian

---

[1] R. Solomon Ganzfried, CODE OF JEWISH LAW: *Kitzur Shulhan Arukh,* Vol. 2, Chapter 82, para. 2..(Hebrew Publishing Company, New York 1993).

symbolic meaning. Secondly, the fundamental symbolic meaning intended to be conveyed by the establishment of an *eruv* is the "creation" of a "legal community." This "legal community," as explained by a leading academic commentator, Professor Charlotte E. Fonrobert, means, specifically, a community of Jews who observe Shabbat according to strict *halakhic* law, i.e., today's Orthodox Jews. Accordingly, the ritual establishment and display of an *eruv* has as its primary symbolic meaning and purpose not the mere practical relaxation of certain of inconvenient *halakhic* rules restricting carrying and pushing objects on the Sabbath, but rather the creation in the eyes of both those practicing such orthodoxy and the public-at-large of a defined and cohesive Orthodox Jewish community within the geographic limits of the larger community. Thus, in the words of Professor Fonrobert, the essential religious purpose of the erection of an *eruv* is to symbolically and visually define a portion of a residential community as a "neighborhood where rabbinic Judaism claims a place of its own."[2]

From the informed perspective of the appellants and others, an *eruv* conveys, and the contemplated *eruv* in Westhampton Beach will convey, a specific and particularized communicative message to adherents of particular branches of the Jewish faith, signaling to them where, when, and what they may permissibly do in public within their understanding and practice of their religion. At the same time,

---

[2] Fonrobert, Charlotte E., *Neighborhood as Ritual Space: The Case of the Rabbinic Eruv*, Berlin 2008, at p. 257-58.

6

an *eruv* conveys, and the contemplated *eruv* in Westhampton Beach will convey, an equally specific and particularized communicative message to the community at large that the municipalities and public utilities have selected one particular form of Judaism for special and preferential treatment. Furthermore, it conveys an especially injurious message to other practicing and observant Jews who do not share the views or practices of the proponents of the *eruv* herein—that whether they like it or not, the practices and beliefs of other forms of the Judaism are nevertheless imposed upon them since their community has literally and symbolically been surrounded by, defined by, and entangled with the physical indicia and accoutrement of a religion they do not practice. *See* A-11-17.

### ii.    *Procedural History and Rulings Below*

This action was commenced by the filing of the Complaint on July 30, 2012. *See* A-9. Service was subsequently made on each of the defendants. Thereafter, defendants-appellees EEEA and Verizon New York, Inc. moved to dismiss the action, which motions were fully submitted on December 12, 2012. A-6, A-39, A-198. At a hearing held on February 4, 2013, in connection with related matters, the District Court (Wexler, J.) granted the motions from the bench without permitting argument, and dismissed the action (as to the movants) without opinion or explanation. *See* A-303-04. Thereafter, on or about March 22, 2013, LIPA moved for a judgment on the pleadings (*see* A-269), which motion was granted by Order

entered on May 21, 2013. *See* A-272. The claims against the Village of Westhampton Beach were voluntarily dismissed on April 2, 2014 in order to terminate the action with finality and in order to take the instant appeal. *See* A-274. Appellants filed their Notice of Appeal on April 25, 2014. *See* A-275.

## SUMMARY OF ARGUMENT

This action was erroneously dismissed by the District Court. Because the standard of review on an appeal is *de novo*, appellants will not dwell on the District Court's "decision" except to note that it was issued orally from the bench without explanation in the context of a hearing held in another action. *See* A-303-04. Accordingly, neither appellants nor this Court have the benefit of knowing the basis for the District Court's decision. Appellees' motions to dismiss, however, were essentially premised upon two arguments—that the appellants lack standing, and that, on the merits, an *eruv* is constitutional and does not violate the Establishment Clause. The arguments fail to provide a meritorious basis for dismissal of this action at the pleading stage.[3]

Appellees' standing arguments fail because appellants have clearly pleaded facts establishing their direct and personal stake in the controversy and the spiritual injury that will result from the establishment of the *eruv* surrounding and

---

[3] To the extent appellees' contention that the *eruv* does not involve any government action could be deemed a separate argument, it must immediately be disposed of since the proposed *eruv* will be erected on public property, in public rights-of-way, on public utility poles, and circumscribing public spaces.

circumscribing their homes and communities. These pleadings, which must be accepted as true at this stage, more than suffice to create Establishment Clause standing under this Court's controlling authority in *Cooper v. United States Postal Service*, 577 F.3d 479 (2d Cir. 2009).

Appellees' argument that an *eruv* does not violate the Establishment Clause is quite obviously an argument on the ultimate merits and, as such, is entirely premature and unavailing as a basis for a pre-answer motion to dismiss. The issue, at this stage, is not whether the *eruv* does or does not in fact violate the Establishment Clause—an important question for a later point of the litigation— but rather whether the plaintiffs-appellants have sufficiently alleged such a violation. Needing only to allege a violation of any one of the three prongs of the *Lemon* test, the Complaint herein sufficiently pleads facts concerning the *eruv*'s violation of all three prongs.

This action asserts a constitutional challenge to the advanced plan and intent of the EEEA to construct an *eruv* within the municipal boundaries of the Villages of Westhampton Beach and Quogue and unincorporated areas of the Town of Southampton. The proposed *eruv* would be constructed on public utility poles owned or controlled by the Long Island Lighting Company d/b/a LIPA, a New York State Public Authority, and Verizon, New York, Inc.—all of which are situated upon public roads and public rights-of-way in the communities, including

9

the defendant Village of Westhampton Beach, where members of the appellant organization reside.

The 300-plus members of the appellant organization, Jewish People for the Betterment of Westhampton Beach, Inc., oppose the establishment of an *eruv* on public property in their neighborhoods based upon sincerely held belief that the erection and permanent display of an *eruv* on public property would cause them to suffer "spiritual injury" as that term has been used by this Court and the United States Supreme Court and would violate the Establishment Clause of the First Amendment to the United States Constitution.  The position of the JPOE and its members is based upon an informed understanding that an *eruv*, contrary to the deliberately vague, incomplete and disingenuous statements of the EEEA, is not a device empty of religious meaning and symbolism, but is, to the contrary, a sectarian ritual device deeply imbued with religious meaning and content which is intended to, and does, convey a narrowly sectarian, and some would say, exclusionary religious message.

Ultimately, the important constitutional question raised by this action will be whether the establishment of the *eruv* on public property, as proposed by the EEEA, constitutes a violation of the Establishment Clause.  The only issue now before this Court, however, is a narrow one—whether the plaintiffs-appellants have sufficiently stated a claim based upon the Establishment Clause.  In order to

state an Establishment Clause claim, a plaintiff need only allege facts asserting a violation of any one of the three mandatory requirements set forth in *Lemon v. Kurtzman*, 403 U.S. 612 (1971)—the "*Lemon* test." Here, appellants have alleged that the proposed *eruv* will violate all three of the *Lemon* requirements and have therefore stated a viable claim.

ARGUMENT

### *Appellate Standard of Review*

The standard of review on appeal from the grant of a motion under Federal Rule of Civil Procedure 12(b)(1) or 12(b)(6), or of a motion under Rule 12(c), all of which constitute a ruling of law, is *de novo*.

### *Standard Applicable to Motions Below*

Under the now well-established *Twombly* standard, a complaint should be dismissed only if it does not contain enough allegations of fact to state a claim for relief that is "plausible on its face." *Thomas v. Little Flower For Rehabilitation & Nursing*, 793 F. Supp.2d 544 (E.D.N.Y. 2011) *citing Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007).

The standard on a motion made pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is that a plaintiff plead sufficient facts "to state a claim for relief that is plausible on its face." *See Twombly*, 127 S.Ct. at 1974. The pleading of specific facts is not required; rather, a complaint need only give the

defendant "fair notice of what the claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 127 S.Ct. 2197, 2200 (2007); *see also Arista Records, LLC v. Doe 3*, 604 F.3d 110, 119-20 (2d Cir. 2010).

In deciding a motion pursuant to Rule 12(b)(6), the Court must liberally construe the claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *See Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008), *quoting Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)); *see also Ruston v. Town Board for Town of Skaneateles*, 610 F.3d 55, 59 (2d Cir. 2010), *cert. denied*, 131 S. Ct. 824 (2010)("When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.")

A motion to dismiss pursuant to Rule 12(b)(6) tests the legal, not the factual, sufficiency of the complaint. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974) ("When a federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."); *Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir. 2000).

Courts, therefore, must accept the factual allegations in the complaint as true, and draw all reasonable inferences in plaintiffs' favor. *See Sheppard v.*

*Beerman,* 18 F.3d 147, 150 (2d Cir. 1994), *cert. denied,* 513 U.S. 816, 115 S. Ct. 73, 130 L. Ed. 2d 28 (1994). Moreover, a court may not grant a Rule 12(b)(6) motion unless it appears beyond doubt that plaintiffs can prove no set of facts that entitle them to relief. *See Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957); *Gregory v. Daly,* 243 F.3d 687, 691 (2d Cir. 2001).

POINT I

APPELLANTS HAVE STANDING[4]

Appellants live, work and reside within the large area appellees seek to convert into a religiously coded space. They do not share in the religious beliefs and spiritual values embodied and expressed by the *eruv.* Moreover, many JPOE members are religious Jews themselves who affirmatively disagree with and reject such beliefs and practices on a personal, spiritual and doctrinal level. Accordingly, appellants will suffer significant spiritual injury as a result of the ubiquitous and inescapable religious symbolism and messages that will be permanently imposed

---

[4] There is no clear indication that the District Court's dismissal was based upon a finding that the plaintiffs-appellants lacked standing to bring the instant Establishment Clause claim. Presumably, since standing is a jurisdictional prerequisite, the District Court would have disposed of the action *in toto* if it had determined that the plaintiffs lacked standing (it did not). Nevertheless, as standing was apparently the appellees' lead argument for dismissal, and in light of the fact that the District Court gave no basis for its decision, we address the issue. If, in fact, standing was the basis for the District Court's dismissal, appellants contend that it was plain error for the reasons set forth herein.

upon them should the *eruv* be established on governmental property circumscribing their homes and communities. Their standing to bring this action to defend their First Amendment rights, thus, could not be more self-evident.

Establishment Clause standing will exist where plaintiffs are "directly affected by the laws and practices against which their complaints are directed." *See School District. of Abington Township v. Schempp*, 374 U.S. 203, 320, 83 S.Ct. 1560 (1963); *see also Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d 49, 72 (2d Cir. N.Y. 2001) (standing to assert an Establishment Clause claim may rest on the plaintiff's direct exposure to the challenged activity). Indeed, the Supreme Court has noted that allegations of such direct injury "surely suffice to give the parties standing to complain." *See id.* The appellants herein enjoy standing based upon this precise basis—the *eruv* constructed around their homes and community, with the assistance and endorsement of the municipal and other governmental defendants herein, will directly affect the appellants (as detailed in the record).

This Court, following Supreme Court precedent, has spoken with significant clarity about Establishment Clause standing and has recognized that an allegation of "spiritual First Amendment injury" is sufficient to establish a plaintiff's "direct and personal stake" in the controversy and thus confer standing. *See Sullivan v. Syracuse Housing Authority*, 962 F.2d 1101, 1107-08 (2d Cir. 1992), citing *Association of Data Processing Service Organizations v. Camp*, 397 U.S. 150, 154,

14

(1969), *Abington*, 374 U.S. 203, 83 S.Ct. 1560; *Cooper v. United States Postal Service*, 577 F.3d 479, 490-91 (2d Cir. 2009). The appellants herein clearly meet these standards.

Indeed, the standing issue in this case is fully controlled by this Court's holding in *Cooper v. United States Postal Service*, 577 F.3d 479 (2d Cir. 2009). The material facts in *Cooper*, concerning the direct exposure to religious materials and symbols, are wholly comparable to those at bar and differ only in the extent to which the appellants herein are even more clearly possessed of standing.

In *Cooper,* the plaintiff chose to patronize a local "contract postal unit" ("CPU") under contract with the United States government. Mr. Cooper objected to the open display of religious materials in the CPU, which he claimed made him "very uncomfortable" and which he perceived as evidencing government sponsorship of the displayed religious materials. *Id.* at 488. Notwithstanding that Mr. Cooper was free to patronize other postal facilities, and despite there being a prominent display of a sign expressly disclaiming any such governmental endorsement of the displayed religious materials, this Court found that Cooper's allegations were sufficient to state a "direct and personal stake" in the controversy and to establish standing to bring an action under the Establishment Clause of the First Amendment based on his alleged "spiritual First Amendment injury," as that

terms was defined by the Court in *Sullivan v. Syracuse Housing Authority*, 962 F. 2d 1101, 1108 (2d Cir. 1992).

In *Sullivan*, this Court addressed an Establishment Clause challenge arising out of the Syracuse Housing Authority contracting for a faith-based entity to operate a religious after-school program in the community center of the public housing development where the plaintiff lived.  This Court concluded that the Authority's conduct deprived Sullivan of his right to use and enjoy the community center, that Sullivan "[found] the alleged establishment of religion offensive," and that the Authority's actions essentially established religion "in a place functionally analogous to Sullivan's own home," and, under those circumstances, held that Sullivan's allegations amounted to a sufficiently "direct and personal stake" in the dispute to confer standing.  *See Sullivan*, 962 F.2d at 1108.

Courts have repeatedly found such direct exposure to religious displays sufficient to establish standing.  *See Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d 49, 72 (2d Cir. N.Y. 2001) (standing to assert an Establishment Clause claim may rest on the plaintiff's direct exposure to the challenged activity); *see also Vasquez v. Los Angeles County*, 487 F.3d 1246, 1252 (9th Cir. 2007) (spiritual harm resulting from one's exposure to a public religious display is sufficient to confer standing); *see also Freedom from Religion Found., Inc. v. Weber*, 2012 U.S. Dist. LEXIS 168190, 8, 2012 WL 5931899 (D. Mont. Nov. 27, 2012) ("to demonstrate

standing to sue a member of the organization must show that he has repeatedly visited the area at issue, he has concrete plans to visit again, and his recreational or aesthetic interests would be harmed without the relief requested").

Here, the detailed and well-pleaded allegations of spiritual injury contained in the Complaint go far beyond the allegation of mere personal "discomfort" with a religious display in a contract postal unit found sufficient to confer standing in *Cooper*, and more than satisfy the "spiritual First Amendment injury" test articulated by this Court in *Syracuse* and applied in *Cooper*. Indeed, as offensive as it was for the plaintiff in *Cooper* to be told that "he could go somewhere else if he didn't like it," the appellants herein cannot "go somewhere else"—their homes sit within the proposed *eruv* and they will be involuntarily, constantly, and permanently exposed to a ritual display that offends them spiritually and violates their constitutional rights.[5]    In this regard, the court in *Vasquez* instructively explained that, "Unlike plaintiffs in *Valley Forge* [upon which the EEEA relies], who were physically removed from defendant's conduct, Vasquez *is a member of the community where the allegedly offending symbol was located, and his contact with the symbol was frequent and regular, not sporadic and remote*." *See Vasquez*, 487 F.3d at 1252 (emphasis added).

---

[5] JPOE is comprised of some 300 individuals, all of whom will be directly affected by the proposed *eruv*.

17

In the motions below, the Appellees challenged appellants' standing on the asserted basis that the appellants did not allege any constitutional injury. The argument is entirely conclusory and simply ignores the allegations in the Complaint. Appellants, after all, have challenged a proposed governmental action that will encircle and place their community and their own private residences *within* a religious symbol erected upon public property for the purpose of marking the territory circumscribed thereby as a space with deep and specific religious meaning that appellants reject spiritually and find offensive.

As Professor Fonrobert, has explained:

> the ritual script of the *eruv* establishes a system of signs . . . that are about place-making, about ritualizing the neighborhood, about making neighborhood matter to religious life (the life of Torah), by establishing a communal intent.[6]

Professor Fonrobert has further explained that the *eruv* devised by rabbinic sages is a:

> ritual system that provided (and continues to provide) a rabbinic signature to Jewish neighborhood, that turns neighborhood into what we may paradoxically designate as a Sabbath territory. As such neighborhood is turned into an essential communal buffer-zone between exposure to the public world of the non-Jewish world which is the space of the other(s), the Jewish household which tugs Jewish practice safely between its four walls.

---

[6] *See* footnote 2, *supra*.

> It is the neighborhood where rabbinic Judaism claims a place of its own. (emphasis added)

Appellants strongly resist the appellees' intention to define their community in this manner and contend that where this ritualization takes place on public property and with government assistance and endorsement, it plainly violates the constitution.

The fact that appellants reside within the proposed *eruv* is by itself conclusive evidence of their personal and direct stake in the controversy. Moreover, appellants have alleged with specificity the acute harm and personal affront that would result were the constitutionally violative *eruv* to be erected.

Appellees' arguments concerning standing in the motions below relied almost exclusively on *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464 (1982). However, this Court's analysis in *Sullivan* expressly distinguished *Valley Forge* for reasons that apply equally to the matter at bar: "Sullivan is not a simple bystander, using the courts to vindicate abstract value interests, or a mere citizen complaining of the nonobservance by others of the Constitution. Nor can we say that the alleged injuries in this case are simply noncognizable psychological consequences produced by observation of personally disagreeable conduct." *See Sullivan*, 962 F.2d at 1108.

By contrast, the plaintiff organization in *Valley Forge*, Americans United for the Separation of Church and State, suffered no direct injury because it had no direct and personal stake in the disposition of the property at issue therein.  Indeed, in concluding that the plaintiffs in *Valley Forge* lacked standing, the Court noted that "although [plaintiffs] claim that the Constitution has been violated, they claim nothing else.  They fail to identify any personal injury suffered by the plaintiffs as a consequence of the alleged constitutional error."  *See Sullivan*, 962 F.2d at 1108, *citing Valley Forge*, 454 U.S. at 485.   This Court noted that while the Establishment Clause "does not provide a special license to roam the country in search of governmental wrongdoing" (*Valley Forge*, 454 U.S. at 487), "Sullivan's position bears no similarity to, and is indeed quite the opposite of, the position of the *Valley Forge* plaintiffs."  *Sullivan*, 962 F.2d at 1109.

In the matter at bar, it is likewise the case that appellants are not seeking to vindicate some abstract value but are instead objecting to their direct and involuntary exposure to the challenged activity.

Notably, in *ACLU of New Jersey v. City of Long Beach*, 670 F.Supp. 1293 (D.N.J. 1987), the court, while ultimately dismissing the action, affirmatively recognized the standing of the plaintiffs there to oppose the creation and maintenance of an *eruv*.  *See id.* at 1294.

Appellees' arguments below attempted to minimize the significant offense and injury that the appellants have alleged will result from the erection of the proposed *eruv*.  Such self-serving characterizations are patently insufficient as a basis to dismiss a complaint.  Moreover, the appellants herein are not seeking to vindicate some abstract interest in the separation of church and state.  Rather, like Mr. Cooper who was confronted by religious imagery in the place he went to mail letters, the appellants herein are resisting governmental action that will visibly encircle their homes with a symbolic ritual system to which they do not subscribe, runs counter to their own privately held religious beliefs and, in the view of many of JPOE's members, purposefully demeans their own observance of Judaism as less worthy of respect than the *eruv* proponents' "legal" Orthodox beliefs.  *See generally, Lee v. Weisman*, 505 U.S. 577, 112 S.Ct. 2649 (1992).

Accordingly, the appellants possess standing.

POINT II

APPELLANTS HAVE STATED AN ESTABLISHMENT CLAUSE CLAIM

Establishment Clause claims, no less than any other legal theory, are entitled to liberal construction at the pleading stage and should be given the opportunity to be developed through discovery. *See Loccenitt v. City of New York*, 2013 U.S. Dist. LEXIS 36330, 13-14 (S.D.N.Y. Mar. 15, 2013) ("Construing Plaintiff's allegations liberally, as required at this stage, Plaintiff's Amended Complaint sufficiently alleges an Establishment Clause Claim"); *see also Am. Atheists, Inc. v. Shulman*, 2014 U.S. Dist. LEXIS 68148, 39 (E.D. Ky. May 19, 2014) (arguments on the ultimate merits are unnecessary at the pleading stage where plaintiff has sufficiently pleaded that actions at issue do not have a secular purpose and improperly endorse religion); *Freedom from Religion Found., Inc. v. New Kensington-Arnold Sch. Dist.*, 919 F. Supp. 2d 648, 660-661, 2013 U.S. Dist. LEXIS 8269, 31-35, 2013 WL 228331 (W.D. Pa. 2013)("Establishment Clause challenges are all unique and driven by the particular facts of the case. Plaintiffs are entitled to a reasonable time in which they may conduct limited discovery in their attempt to garner support for the cause they pursue.").

*Appellants Have Alleged Facts Supporting the Claim that the Proposed Eruv Will* <u>*Violate the Establishment Clause*</u>

The three-prong analysis first articulated by the Supreme Court in *Lemon v. Kurtzman*, 403 U.S. 612 (1971) continues to be the test for claims brought under Establishment Clause in this Circuit. *See Commack Self-Service Kosher Meats, Inc. v. Hooker*, 680 F. 3d 194, 205 (2d Cir. 2012). *See also*, *Skoros v. City of New York*, 437 F.3d 1, 58 (2d Cir. 2006), citing *Peck v. Baldwinsville Cent. Sch. Dist.*, 426 F.3d 617, 634 (2d Cir. 2005); *Kiryas Joel Alliance v. Vill. of Kiryas Joel*, 495 Fed. Appx. 183 (2d Cir. 2012) (applying *Lemon* test to Establishment Clause claim); see also *Bronx Household of Faith v. Bd. of Educ. of City of NY*, 650 F.3d 30, 40 n.9 (2d Cir. 2011) ("Although the *Lemon* test has been much criticized, the Supreme Court has declined to disavow it and it continues to govern the analysis of Establishment Clause claims in this Circuit."), cert. denied, 132 S. Ct. 816, 181 L. Ed. 2d 541 (2011).

The *Lemon* test provides that, in order to sustain a governmental action or policy challenged under the Establishment Clause, the court must find that each of the following conditions are met (i) the governmental action has a secular purpose; (ii) the principal or primary effect of the government action may not be to either advance or inhibit religion; and (iii) the government action may not foster excessive governmental entanglement with religion. *Commack Self-Service*

*Kosher Meats, Inc. v. Hooker*, 680 F. 3d 194, 205 (2d Cir. 2012)(citing *Lemon,* 403 U. S. 602).

While the *Lemon* test informs what will constitute a sufficiently pleaded Establishment Clause claim, the three prongs do not form the "elements" of an Establishment Clause claim.   Rather, the test describes three mandatory conditions—all of which must be satisfied *by the government* in order to avoid a constitutional violation.   Accordingly, if the challenged action fails any one of these three prongs, the action is constitutionally prohibited.  *Stone v. Graham*, 449 U.S. 39, 40-41, 101 S. Ct. 192, 193 (1980) ("If a statute violates any of these three principles, it must be struck down under the Establishment Clause."); *see also Edwards v. Aguillard*, 482 U.S. 578, 582-83, 107 S. Ct. 2573, 2577 (1987); *Goldstein v. Fire Dep't of Suffern*, 559 F. Supp. 1389, 1391 (S.D.N.Y. 1983) ("If any one of these aspects of the test is not satisfied, the challenged act will be held to violate the Establishment Clause.").

Correspondingly, if a plaintiff pleads facts concerning a violation of  even one of the three *Lemon* requirements, it will have stated a claim under the Establishment Clause.  "The state action must satisfy all three criteria . . . and thus, a party alleging an Establishment Clause violation need only allege that the state action runs afoul of one of these three elements." *Freedom from Religion Found., Inc. v. Cherry Creek Sch. Dist.*, 2008 U.S. Dist. LEXIS 76938, 7-9n (D. Colo.

Sept. 8, 2008), citing *Stone v. Graham*, 449 U.S. 39, 40-41, 101 S. Ct. 192 (1980). Nevertheless, in the matter at bar, the EEEA's proposal to erect an *eruv* on public utilities located on governmental property in the Villages of Westhampton Beach and Quogue fails all three prongs of the *Lemon* test, and the complaint herein has plainly pleaded as much.

Appellants have alleged, *inter alia*, that:

> The establishment of an *eruv* within the Village of Westhampton Beach will constitute a violation of the Establishment Clause of the First Amendment to the United State Constitution and cause real and actual harm to the community and its residents. The *eruv* contemplated and intended for imminent construction by Defendant East End Eruv Association ("EEEA"), with the aid and cooperation of defendants Verizon and LIPA, will mark certain wholly public spaces within the Village with religious significance. Indeed, it will invest a large portion of the Village with a narrow and parochial religious function. Although proponents of the *eruv* are quick to tout what they contend is the *nearly* invisible nature of the *lechis* and other components of the *eruv*, it is those same proponents themselves who insist, based upon their particular interpretation of Jewish law, on the actual physical presence of the *eruv*. The *eruv*, of course, will *not* go unnoticed; rather, it will be a constant and ever-present symbol, message and reminder to the community at large, that the secular public spaces of the Village have been transformed for religious use and identity; to the non-Jewish residents, that the Village and LIPA have given preferred status to the Jewish religion as the only faith permitted to permanently affix religious symbols to utility poles within the Village or to physically demarcate certain public spaces with particular religious significance; and to large portions of the Jewish community within the Village, that one

25

particular form of Judaism has been preferred and
endorsed by the Village over another.

*See* A-9.

### (i)    An Eruv Serves No Secular Governmental Purpose

Appellants have alleged, based upon their own personal, informed

beliefs and experiences, that the true purpose of the *eruv* and the *eruv* ritual symbol

is "to openly and *visibly* demarcate a certain geographic area as a *Jewish* precinct,

i.e., a symbolic extension of a *Jewish* home."  *See* A-11.  Appellants have alleged

that "*eruv*, by its very nature, is inherently a religious symbol, whose physical

presence and embodiment or significance except as the visual expression and

public communication of its adherents' personal, individual interpretation of

Jewish law and religious beliefs."  *See* A-15.  They have also alleged that the

suggestion that they "should not be concerned or offended by the prospect of the

erection of an *eruv* to demarcate the neighborhoods where they live and work,

because they 'won't notice it' or might somehow not understand what it

symbolizes, is truly condescending and offensive to JPOE and its members, who

will be confronted with the EEEA's religious display on a daily basis." *See* A-11.

JPOE members understand the *eruv* to function in precisely the manner

described by Professor Fonrobert—that is, as a "ritualization of the neighborhood,"

as something that "is not just another example of rabbinic legal lenience" but rather

is "about making the neighborhood matter to religious life (the life of the Torah),"

as something that "turns [the] neighborhood into . . . Sabbath territory . . . where rabbinic Judaism claims a place of its own."[7]

It is difficult to conceive of a more purely sectarian and religious, less secular, purpose than the symbolic creation of a community defined solely by its adherence to a particular set of religious rules or religious denomination.  Such a purpose clearly serves no secular or governmental purpose whatsoever.

The effort by appellees to claim some kind of secular govermental purpose for an *eruv*, that is "genuine, not a sham," or not at best, "secondary" (*Skoros v. City of New York*, 437 F.3d 1, 19-20 (2d Cir. 2006) is totally unconvincing and plainly pretextual.  The appellees' principal assertion is the claim that the establishment of an *eruv* permits "observant," i.e., Orthodox, Jews to engage in certain ordinary, everyday "secular" activities, such as pushing and carrying outside the home, or to have access to public lands, or to spend time with their families, which otherwise would be prohibited or rendered more inconvenient by their strict observance of *halakhic* law.  But this argument simply does not withstand logical scrutiny.  To begin with, this is not a *governmental purpose* at all, as required by the first prong of *Lemon.*  In any event, there is nothing actually preventing these individuals from engaging in any of these activities at will, except their own religious conviction, and the sole purpose and effect of the establishment

---

[7] *See* footnote 2, *supra*.

of an *eruv* is the purely religious purpose of providing a religious justification to modify and relax these religious strictures—all of which constitutes, in any case, *religious* observance and practice in which the display of the eruv as a *religious* symbol is deemed by the proponents to be doctrinally necessary..

In short, the function of the *eruv* itself is purely and quintessentially sectarian and religious.  As the appellants have alleged, the *eruv* has a deeply symbolic and purely religious meaning accorded to it by Orthodox Jewish religious authorities.  *See* A-15.  The fundamental purpose and effect of an *eruv*, in Orthodox Jewish tradition, is the symbolic creation of a community defined by its adherence to Orthodox Jewish religious laws, and thereby, among other things, to permit the substitution of one set of religious rules for the observance of the Sabbath for another.  *See* A-11-17.   The effort to claim for such a self-evidently religious ritual symbol a secular governmental purpose is patently absurd.

### (ii)    *The Sole Purpose and Effect of the proposed Eruv is the Advancement of a Particular Religious Denomination*

The second prong of the *Lemon* test prohibits any government action that has as its "principal or primary effect" the advancement of religion.  *Commack,* 294 F. 3d at 430.  For the reasons previously stated, it is impossible to fairly view the use of government property to display a ritual symbol whose true purpose is the symbolic creation of a religious community defined by its adherence to a specific body of sectarian laws as having any purpose other than the advancement of

religion, specifically in this case, the advancement of the Orthodox Jewish religious community.

When addressing the merits of a second prong challenge, a court must determine "whether 'the challenged governmental action is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents, as a disapproval, of their individual religious choices.'" *County of Allegheny*, 492 U.S. at 597. Here, at the pleading stage, appellants have sufficiently pleaded a second prong claim by alleging that they will reasonably perceive the erection of the *eruv* on public property as an endorsement of one form of sectarian religious practice and as a disapproval of their own. *See* A-11-17.

Moreover, while appellants' allegations regarding their present understanding of the meaning and significance of the *eruv* is sufficient to both establish their standing and state a claim under the Establishment Clause, they intend and are entitled to pursue these factual issues in discovery.

The appellees' approach to this issue below was a classic strategy of avoidance and denial, beginning with the conspicuous refusal to offer any candid or meaningful explanation of their own concerning the underlying religious content or principles that give the *eruv* any meaning at all as a religious object. However, the constitutional analysis commanded by the second prong of the *Lemon* test simply cannot be performed unless the Court is provided with a meaningful

explanation of the actual content of the religious message that is the subject of the dispute.  It is clear from what has been stated above that no such explanation has ever been furnished by the *eruv* proponents.

The EEEA position that judicial consideration of these matters ought not consider the religious meaning  of the activities at issue is directly contrary to binding Supreme Court jurisprudence on this issue, which has emphatically rejected such a head-in-the-sand approach, labeling it a "prescription of ignorance."  *See County of Allegheny v. ACLU*, 492 U.S. 573, 679, fn 60, 109 S. Ct. 3086 (1989).  Instead, the Supreme Court has mandated that a full inquiry into the relevant religious issues is constitutionally required:

> Any inquiry concerning the government's use of a religious object to determine whether that use results in an unconstitutional religious preference requires a review of the factual record concerning the religious object -- even if the inquiry is conducted pursuant to Justice Kennedy's "proselytization" test. Surely, Justice Kennedy cannot mean that this Court must keep itself in ignorance of the symbol's conventional use and decide the constitutional question knowing only what it knew before the case was filed. This prescription of ignorance obviously would bias this Court according to the religious and cultural backgrounds of its Members, a condition much more intolerable than any which results from the Court's efforts to become familiar with the relevant facts.

*County of Allegheny v. ACLU*, 492 U.S. 573, 679, fn 60, 109 S. Ct. 3086 (1989).

In addition, the Supreme Court has recognized the value of referring to source materials when conducting legal analysis required to resolve the constitutional issues.

> Moreover, the relevant facts concerning Chanukah and the menorah are largely to be found in the record, as indicated by the extensive citation to the Appendix, supra, at 582-585. In any event, Members of this Court have not hesitated in referring to secondary sources in aid of their Establishment Clause analysis, see, e. g., Lynch, 465 U.S., at 709-712, 721-724 (Brennan, J., dissenting), because the question "whether a government activity communicates an endorsement of religion" is "in large part a legal question to be answered on the basis of judicial interpretation of social facts," id., at 693-694 (O'Connor, J., concurring). *Id.*

The same considerations apply to the "endorsement" test articulated by Justice O'Connor in her concurring opinion in *Lynch v. Donnelly*, 465 U.S. 668 (1984), and applied to the second prong of the *Lemon* test in such cases as *Skoros v. City of New York,* 37 F.3d 1 (2d Cir. 2006).  This test requires the court to determine whether a challenged government action, in this case, the permanent display of an *eruv* on governmental property, would be perceived by a "reasonable, informed observer" to constitute forbidden governmental "endorsement or sponsorship of religion."  *Skoros,* 37 F.3d at 29.

Such a determination, as Justice O'Connor emphasized, must begin with a consideration of both the subjective and the *objective* meaning of the message

31

being communicated: "The meaning of a statement to its audience depends both on the intention of the speaker and on the "objective" meaning of the statement in the community … Examination of the subjective and objective components of the message communicated by a government action is therefore necessary to determine whether the action carries a forbidden meaning." *Lynch v. Donnelly,* 465 U.S. at 690.

Here, the "objective" message intended to be conveyed by the establishment and display of an *eruv*, as discussed above, is the symbolic creation and presence of the community of Orthodox Jews, and the symbolic separation of that sectarian community from the larger community of non-Orthodox "non-Jews" and non-Jewish residents. *See* A-11-17.

In light of this objective meaning of an *eruv*, as defined by the rabbinical sources themselves, a "reasonable, informed observer," e.g., informed Reform Jewish residents of Westhampton Beach and Quogue, such as members of JPOE, would reasonably and justifiably understand the permanent display of an *eruv* by their own local governments as an endorsement or sponsorship the Orthodox Jewish community as a separate, sectarian community. Indeed, as pointed out previously, that is the very heart of the message the rabbinic inventors of the *eruv* ritual intended it to convey.

32

The appellees additionally argued below that the fact that the municipal governments, in keeping with their constitutional obligations to avoid the appearance of any endorsement of religion, have responsibly declined to immediately capitulate to the EEEA application somehow automatically negates the appearance of governmental endorsement or sponsorship. The argument is utterly circular. Were this argument to be adopted by the courts, no governmental body could ever bring a challenge against a proposed public display of a religious symbol, no matter how blatant, without by the same action legitimizing same. Clearly, that is not what Justice O'Connor or any other court adopting the "endorsement" test intended. The "endorsement" test requires the court to consider the objective message that would be conveyed in the eventuality that the proposed religious symbol were in fact displayed on government property. The fact that a responsible government body, in keeping with its constitutional obligations, carefully considers efforts to erect a religious display on public property, cannot convert plainly unconstitutional government, prohibited action into a constitutional one any more than the posted disclaimer could insulate the Post Office from such a violation in *Cooper*.

### (iii)    *The Public Display of an Eruv on Governmental Property Will Result in The Impermissible Entanglement of Government in Religion*

The final prong of the *Lemon* test prohibits any government action which would foster excessive governmental entanglement with religion.  *Commack Self-Service Kosher Meats, Inc. v. Hooker*, 680 F. 3d 194, 205 (2d Cir. 2012) citing *Lemon,* 403 U.S. 602.  In order to determine whether the government entanglement with religion is excessive, [courts] must examine the character and purposes of the institutions that are benefited, the nature of the aid that the [government] provides, and the resulting relationship between the government and the religious authority. *Lemon v. Kurtzman*, 403 U.S. 602, 615, 91 S. Ct. 2105, 2112 (1971).

In this case, it is clear that the actions of both the Villages of Westhampton Beach and Quogue, and LIPA (a New York State Public Authority) in permitting the permanent hosting and display of an *eruv* on their governmental property would inevitably foster precisely such excessive and prohibited governmental entanglement in religion.  Indeed, by offering its public spaces for the erection and establishment of an elaborate ritual system designed to "ritualize the neighborhood" and to convert a diverse, pluralistic community into "Sabbath territory," the government actors herein will definitively and excessively entangle themselves with religion.

It has long been recognized that the principal societal harm intended to be addressed and avoided by the constitutional prohibition against excessive

governmental entanglement in religion is the danger of political and social fragmentation on religious lines.  The drafters of the Constitution wrote against the backdrop of centuries of sectarian religious wars in Europe, and were all too aware of the danger that political and social divisiveness along religious lines posed to the peace and harmony of the young Republic.  The drafters recognized that even mere the appearance of government favoritism or support for one sectarian group against another risked a dangerous intensification of such conflicts.  Thus, as Chief Justice Burger wrote for the majority in *Lemon*, "[p]olitical fragmentation and divisiveness on religious lines are thus likely to be intensified."  *Lemon*, 403 U. S. at 615.

The same point is made in even stronger terms by Justice O'Connor in *Lynch,* in the context of her "endorsement" approach:

> The Establishment Clause prohibits government from making adherence to a religion relevant in any way to a person's standing in the political community. Government can run afoul of that prohibition in two principal ways.  One is excessive entanglement with religious institutions, which may interfere with the independence of the institutions, give the institutions access to government or governmental powers not fully shared by nonadherents of the religion, and foster the creation of political constituencies defined along religious lines. E.g., *Larkin v. Grendel's Den, Inc.*, 459 U.S. 116 (1982).  The second and more direct infringement is government endorsement or disapproval of religion. *Endorsement sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community.*

35

> *Disapproval sends the opposite message.* See generally
> *Abington School District*, 374 U.S. 203 (1963).

*Lynch*, 465 U.S. at 619 (emphasis added).

It goes without saying that the EEEA and it members have the absolute constitutional right to observe their religion according to their own laws and traditions, to exclude whoever they choose, and to lay claim to unique possession of religious authority and truth for their own views, if they are so disposed. However, we live in a pluralistic society, in which such claims to absolute religious authority and truth are apt to be passionately and emotionally challenged by the adherents of other religious views, or those who deny any religious truths whatsoever.[8]

For example, as alleged in the Amended Complaint, the Central Conference of American Rabbis ("CCAR"), which holds itself out as the "oldest and largest rabbinic organization in North America" and is generally viewed as the authoritative voice of the Reform Jewish movement,[9] which is by far the largest American Jewish denomination, has officially rejected and criticized the ritual of

---

[8]  *See Burwell v. Hobby Lobby Stores, Inc.*, 2014 U.S. LEXIS 4505, 143, fn. 25, 2014 WL 2921709 (2014) (GINSBURG, J. dissenting) ("the government's license to grant religion-based exemptions from generally applicable laws is constrained by the Establishment Clause. [W]e are a cosmopolitan nation made up of people of almost every conceivable religious preference, a rich mosaic of religious faiths. Consequently, one person's right to free exercise must be kept in harmony with the rights of her fellow citizens . . .") (internal citations and quotations omitted)

[9]  "About the CCAR,"  http://www.ccarnet.org/about-us

the *eruv* as a kind of "legal fiction" which is not in conformance with the true "spirit" of Jewish law.[10]  *See* A-11-17.

In this case, based upon the informed understanding by the appellants and others as to what the *eruv* communicates, the action of governmental bodies such as the Villages and LIPA in permitting and indeed hosting the permanent display of an *eruv* on public property is clearly forbidden by the Establishment Clause, as interpreted under the *Lemon* test and may not be permitted in this case.

Accordingly, appellants have sufficiently pleaded a claim arising under the Establishment Clause.

---

[10] CCAR Responsa No. 178. Eruv.  The CCAR Responsa are issued by the Responsa Committee of the CCAR, which is identified as one of the "core committees" of the CCAR in its Constitution and By-Laws, and therefore reflects the official position of the CCAR as a body.  http://www.ccarnet.org/about-us/consitution-bylaws/.

CONCLUSION

Based upon the foregoing, Plaintiffs-Appellants respectfully request that the orders of the District Court granting the appellees' motions to dismiss be reversed.

Respectfully submitted,

SINNREICH KOSAKOFF & MESSINA LLP

s/ Timothy F. Hill
Jonathan Sinnreich
Timothy F. Hill
267 Carleton Avenue, Suite 301
Central Islip, New York 11722
(631) 650-1200

*Attorney for Plaintiffs-Appellants*

Dated: Central Islip, New York
July 2, 2014

## CERTIFICATE OF COMPLIANCE WITH F.R.A.P. RULE 32(a)

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B). It contains 8,638 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). It has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14 point font.

Dated: July 2, 2014

SPECIAL APPENDIX

**i**

# Table of Contents

**Page**

Order of the Honorable Leonard D. Wexler,
  Dated May 21, 2013, Appealed From ..................................... SPA-1

Case 2:12-cv-03760-ARL   Document 28   Filed 05/21/13   Page 1 of 2 PageID #: 658
Case 2:12-cv-03760-LDW-ARL   Document 27-1   Filed 05/17/13   Page 1 of 2 PageID #: 656



F I L E D
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ MAY 21 2013 ★

LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

JEWISH PEOPLE FOR THE BETTERMENT OF
WESTHAMPTON BEACH, et al.,

                      Plaintiffs,

-against-

THE VILLAGE OF WESTHAMPTON BEACH, et
al.,

                      Defendants.

**2:12-CV-3760 (LDW)**

**ORDER**

## ORDER GRANTING MOTION FOR JUDGMENT ON THE PLEADINGS

WHEREAS Defendant Long Island Lighting Company d/b/a LIPA ("LIPA"),
moved this Court, by Motion dated March 22, 2013, for an order pursuant to Rule 12(c)
of the Federal Rules of Civil Procedure granting LIPA judgment on the pleadings, and
said Motion incorporated by reference certain arguments made by Defendant Verizon
New York Inc. in its Motion to Dismiss, ECF No. 24-1;

WHEREAS Plaintiffs submitted an opposition, which incorporated by reference
the arguments set forth in its oppositions to the motions to dismiss by defendants Verizon
New York Inc. and the East End Eruv Association, ECF Nos. 23-3 – 23-10 and 24-8 –
24-15; and

WHEREAS all parties agree that oral argument on the Motion is unnecessary; it is
now

**ORDERED** that LIPA's motion for judgment on the pleadings is granted and
Plaintiffs' claims against LIPA are dismissed in their entirety.

**SPA-2**

**SO ORDERED.**

Dated: Central Islip, New York

_MAY  21_ , 2013

s/ Leonard D. Wexler

Hon. Leonard D. Wexler
United States District Judge

2